UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

EAST SIDE PARKWAYS COALITION, WESTERN
NEW YORK YOUTH CLIMATE COUNCIL,
CITIZENS FOR REGIONAL TRANSIT, ZION
RICHARDSON, DAVID RICHARDSON, JOSHUA
PATTON, EMERE NIEVES, MARCIA E. LADIANA,
BERNADETTE M. MADIANA, XAVIER C. JAMES,
TIFFANY GRACE HILL, BOBBIE HICKS, ELISA
ALEX GILBERT, CHARLENE FUQUA'-MILES,
SCOTT BREWER, WAYNE BLASSINGAME,
DENNICE BARR, PATRICK A. CRAY SR.,
KENNETH JOHNSON, LESLIE GARDNER,
RONALD SILMAN, FAYAH WINNER, VALENCIA
SCALES, NOLAN SCALES, SHAWN MARTIN,
LINDA ANDERSON, PAGAN FRAISER, EVE
SHIPPENS, ANDRE R. BETTS II, CHERYL
GRIFFIN, CYNTHIA R. BARBER, JUNE R.
THOMPSON, VICKY PEYTON, LAUREEN
NICHOLS, FREDDIE MILLS, CLAUDIA N.
BIGHAM, MATTHEW D. CHASE, TERRY ANN
PATTERSON, KIMBERLY SMILEY, DENISE B.
WILSON-SHANNON, JOYCE WILSON, HEATHER
CRAIG, TARA MARTIN, STEPHEN RUTHERFORD,
ULYSSES GREEN, MELISSA VIRELLE, LORNA
PETERSON, CHARLES E. WASHINGTON,
SHIRLEY HOUGH, SHARON L. MACK, JUSTIN
COLVIN, JUSTIN STACHOWSKI, CHERYL D.
HARRIS, URSULA Y. GOODLOE,

     Plaintiffs,

  v.

FEDERAL HIGHWAY ADMINISTRATION;
SHAILEN BHATT, in his official capacity as
Administrator of the Federal Highway Administration;
RICHARD J. MARQUIS, in his official capacity as
Division Administrator, New York Division of the
Federal Highway Administration;
NEW YORK STATE DEPARTMENT OF
TRANSPORTATION,
MARIE THERESE DOMINGUEZ, in her official
capacity as the Commissioner of New York State

**COMPLAINT**

Civ. No. _____

Department of Transportation, and
STEPHANIE WINKELHAKE, P.E., in her official
capacity as the New York State Department of
Transportation Chief Engineer

Defendants.

_____

## NATURE OF THE CLAIMS

1.      Plaintiffs East Side Parkways Coalition ("ESP"), by its members,

Western New York Youth Climate Council ("WNYYCC"), by its members, Citizens for

Regional Transit ("CRT"), by its members, and Zion Richardson, David Richardson,

Joshua Patton, Emere Nieves, Marcia E. Ladiana, Bernadette M. Madiana, Xavier C.

James, Tiffany Grace Hill, Bobbie Hicks, Elisa Alex Gilbert, Charlene Fuqua'-Miles, Scott

Brewer, Wayne Blassingame, Dennice Barr, Patrick A. Cray Sr., Kenneth Johnson, Leslie

Gardner, Ronald Silman, Fayah Winner, Valencia Scales, Nolan Scales, Shawn Martin,

Linda Anderson, Pagan Fraiser, Eve Shippens, Andre R. Betts II, Cheryl Griffin, Cynthia

R. Barber, June R. Thompson, Vicky Peyton, Laureen Nichols, Freddie Mills, Claudia N.

Bigham, Matthew D. Chase, Terry Ann Patterson, Kimberly Smiley, Denise B. Wilson-

Shannon, Joyce Wilson, Heather Craig, Tara Martin, Stephen Rutherford, Ulysses Green,

Melissa Virelle, Lorna Peterson, Charles E. Washington, Shirley Hough, Sharon L. Mack,

Justin Colvin, Justin Stachowski, Cheryl D. Harris, and Ursula Y. Goodloe (collectively

"Plaintiffs"), by their attorneys Phillips Lytle LLP bring this action against the Federal

Highway Administration and its Joint Lead Agency, the New York State Department of

Transportation (collectively for purposes of this action "FHWA"); Shailen Bhatt, in his

official capacity as Administrator of the FHWA; Richard J. Marquis, in his official capacity

- 2 -

as Division Administrator, New York Division of the FHWA, Marie Therese Dominguez in her official capacity as the Commissioner of the New York State Department of Transportation and Stephanie Winkelhake, P.E. in her official capacity as the Chief Engineer of the New York State Department of Transportation. (collectively, "Defendants") to halt the proposed construction of a massive ¾'s of a mile long tunnel over a section of NYS Route 33 ("Kensington Expressway") in the heart of a densely populated disadvantaged residential community between Best Street and Sidney Street in the City of Buffalo (33 Kensington Expressway Project P.I.N. 5512.52 ("Project")).

2.      The Project involves Construction of the massive Billion dollar plus Project which involves the acquisition and use of rights-of-ways on 53 properties including the National Register listed MLK Jr. Park, the excavation of significant amounts of rock which currently lie under the Expressway including approximately 2,200 feet of blast removal with explosive charges, the construction of two approximately 4,150 foot long tunnels (one for each direction of traffic) over 4 and ½ years (longer if there are construction delays) and during which there will be significant traffic displacement from the 75,000 vehicles per day that currently utilize the Expressway, and, ultimately, the capping of the Expressway approximately 50 feet or so from hundreds of residential, all of which will result in significant adverse impacts upon Plaintiffs and the surrounding community.

3.      Despite this, FHWA, in a flawed process conducted under the National Environmental Policy Act, 42 U.S.C. §§ 4321 *et seq.* ("NEPA"), issued a Finding of No Significant Impact ("FONSI") for the Project in violation of the statutory requirements of NEPA as well as the requirements of Section 106 of the National Historic

Preservation Act of 1966, 54 U.S.C. §§ 300101 *et seq.* ("NHPA") and Section 4(f) of the Department of Transportation Act. 49 U.S.C. § 303(c) ("DOTA").

## JURISDICTION AND VENUE

4.     This action arises under NEPA, NHPA, DOTA and the Administrative Procedure Act, 5 U.S.C. §§ 701 *et seq.* ("APA").

5.     This Court has jurisdiction over this action pursuant to the APA and 28 U.S.C. § 1331 (federal question).

6.     The Court has the authority to issue the requested declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201–2202 and 5 U.S.C. §§ 705–706. Injunctive relief is authorized by Rule 65 of the Federal Rules of Civil Procedure. Injunctive relief is authorized by Rule 65 of the Federal Rules of Civil Procedure.

7.     The relief requested would redress the actual, concrete injuries to the Plaintiffs caused by the FHWA's failure to comply with its duties mandated by the APA NEPA and NHPA, and their implementing regulations.

8.     The challenged agency action is final and subject to judicial review pursuant to 5 U.S.C. §§ 702, 704, and 706.

9.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because Erie County in Western New York is where the Project is proposed to be constructed and where material events at issue in this action took place.

## PARTIES

10.     Plaintiff ESP is an unincorporated association of citizens, including members of the community at large, who have residences or offices in the vicinity of the Project area that would be impacted by the Project.  ESP was formed to, among other

things, preserve and protect the environment for the benefit of residents living in the local community by performing activities such as working with elected officials and the public on environmental issues and ensuring compliance with the governing land use, zoning, and state and federal environmental laws, as well as applicable codes, and regulations.

11.    ESP has several members who individually have standing to bring this action, the claims herein are representative of the organizational purposes ESP asserts, and this action does not require the participation of individual members other than those who may appear individually as Plaintiffs.

12.    Plaintiff Western New York Youth Climate Council ("WNYYCC") is an association comprised of young citizens of Buffalo and Western New York dedicated to bringing youth leadership to the forefront of the region's climate justice movement through policy, direct action, and education to create a livable future for all of Western New York.

13.    Members of the WNYYCC have ranged in age from as young as 11 years old to 22-year-old college students.  The WNYYCC was formed because its members recognize that as young people, they are more likely to experience adverse effects of climate change, including adverse mental health consequences.

14.    WNYYCC has several members who individually have standing to bring this action, the claims herein are representative of the organizational purposes WNYYCC asserts, and this action does not require the participation of individual members.

15.    Plaintiff Citizens for Regional Transit ("CRT") is a grassroots, member-supported organization committed to the improvement and expansion of public transportation for all citizens of Western New York. CRT has advocates for transportation projects that reduce vehicle dependency and reduce greenhouse gas emissions.

16.     CRT's members live throughout Western New York including in close proximity to the Kensington Expressway.  CRT has several members who individually have standing to bring this action, the claims herein are representative of the organizational purposes CRT asserts, and this action does not require the participation of individual members.

17.     Plaintiff Zion Richardson resides at 641 Humboldt Parkway, Buffalo New York, lives or works in proximity to and frequents the Project area, will be negatively impacted by, among other things, the noise, dust, vibrations, and reduced air quality in the vicinity of their home, and is specially harmed by the construction and operation of the Project.

18.     Plaintiff David Richardson resides at 641 Humboldt Parkway, Buffalo New York, lives or works in proximity to and frequents the Project area, will be negatively impacted by, among other things, the noise, dust, vibrations, and reduced air quality in the vicinity of their home, and is specially harmed by the construction and operation of the Project.

19.     Plaintiff Joshua Patton resides at 494 Moselle Street, Buffalo New York, lives or works in proximity to and frequents the Project area, will be negatively impacted by, among other things, the noise, dust, vibrations, and reduced air quality in the vicinity of their home, and is specially harmed by the construction and operation of the Project.

20.     Plaintiff Emere Nieves resides or has resided at 849 Humboldt Parkway, Buffalo New York, lives or works in proximity to and frequents the Project area, will be negatively impacted by, among other things, the noise, dust, vibrations, and reduced

air quality in the vicinity of their home, and is specially harmed by the construction and operation of the Project.

21.     Plaintiff Marcia E. Ladiana resides at 845 Humboldt Parkway, Buffalo New York, lives or works in proximity to and frequents the Project area, will be negatively impacted by, among other things, the noise, dust, vibrations, and reduced air quality in the vicinity of their home, and is specially harmed by the construction and operation of the Project.

22.     Plaintiff Bernadette M. Ladiana resides at 849 Humboldt Parkway, Buffalo New York, lives or works in proximity to and frequents the Project area, will be negatively impacted by, among other things, the noise, dust, vibrations, and reduced air quality in the vicinity of their home, and is specially harmed by the construction and operation of the Project.

23.     Plaintiff Xavier C. James resides at 396 Guilford Street, Buffalo New York, lives or works in proximity to and frequents the Project area, will be negatively impacted by, among other things, the noise, dust, vibrations, and reduced air quality in the vicinity of their home, and is specially harmed by the construction and operation of the Project.

24.     Plaintiff Tiffany Grace Hill resides at 147 Brunswick Boulevard, Buffalo New York, lives or works in proximity to and frequents the Project area, will be negatively impacted by, among other things, the noise, dust, vibrations, and reduced air quality in the vicinity of their home, and is specially harmed by the construction and operation of the Project.

25.     Plaintiff Bobbie Hicks resides at 791 Humboldt Parkway, Buffalo New York, lives or works in proximity to and frequents the Project area, will be negatively impacted by, among other things, the noise, dust, vibrations, and reduced air quality in the vicinity of their home, and is specially harmed by the construction and operation of the Project.

26.     Plaintiff Elisa Alex Gilbert resides at 681 Humboldt Parkway, Buffalo New York, lives or works in proximity to and frequents the Project area, will be negatively impacted by, among other things, the noise, dust, vibrations, and reduced air quality in the vicinity of their home, and is specially harmed by the construction and operation of the Project.

27.     Plaintiff Charlene Fuqua'-Miles resides at 623 Humboldt Parkway, Buffalo New York, lives or works in proximity to and frequents the Project area, will be negatively impacted by, among other things, the noise, dust, vibrations, and reduced air quality in the vicinity of their home, and is specially harmed by the construction and operation of the Project.

28.     Plaintiff Scott Brewer resides at 344 Humboldt Parkway, Buffalo New York, lives or works in proximity to and frequents the Project area, will be negatively impacted by, among other things, the noise, dust, vibrations, and reduced air quality in the vicinity of their home, and is specially harmed by the construction and operation of the Project.

29.     Plaintiff Wayne Blassingame resides at 102 Hamlin Road, Buffalo New York, lives or works in proximity to and frequents the Project area, will be negatively impacted by, among other things, the noise, dust, vibrations, and reduced air quality in the

vicinity of their home, and is specially harmed by the construction and operation of the Project.

30.     Plaintiff Dennice Barr resides at 138 Grape Street, Buffalo New York, lives or works in proximity to and frequents the Project area, will be negatively impacted by, among other things, the noise, dust, vibrations, and reduced air quality in the vicinity of their home, and is specially harmed by the construction and operation of the Project.

31.     Plaintiff Patrick A. Cray Sr. resides at 78 Morningstar Court, Amherst New York, lives or works in proximity to and frequents the Project area, will be negatively impacted by, among other things, the noise, dust, vibrations, and reduced air quality in the vicinity of their home, and is specially harmed by the construction and operation of the Project.

32.     Plaintiff Kenneth Johnson resides at 666 Humboldt Parkway, Buffalo New York, lives or works in proximity to and frequents the Project area, will be negatively impacted by, among other things, the noise, dust, vibrations, and reduced air quality in the vicinity of their home, and is specially harmed by the construction and operation of the Project.

33.     Plaintiff Leslie Gardner resides at 298 E. Delevan, Buffalo New York, lives or works in proximity to and frequents the Project area, will be negatively impacted by, among other things, the noise, dust, vibrations, and reduced air quality in the vicinity of their home, and is specially harmed by the construction and operation of the Project.

34.     Plaintiff Ronald Silman resides at 247 Blaine Avenue, Buffalo New York, lives or works in proximity to and frequents the Project area, will be negatively impacted by, among other things, the noise, dust, vibrations, and reduced air quality in the

vicinity of their home, and is specially harmed by the construction and operation of the Project.

35.    Plaintiff Fayah Winner resides at 11 Dignity Circle, Buffalo New York, lives or works in proximity to and frequents the Project area, will be negatively impacted by, among other things, the noise, dust, vibrations, and reduced air quality in the vicinity of their home, and is specially harmed by the construction and operation of the Project.

36.    Plaintiff Valencia Scales resides at 835 Humboldt Parkway, Buffalo New York, lives or works in proximity to and frequents the Project area, will be negatively impacted by, among other things, the noise, dust, vibrations, and reduced air quality in the vicinity of their home, and is specially harmed by the construction and operation of the Project.

37.    Plaintiff Nolan Scales resides at 835 Humboldt Parkway, Buffalo New York, lives or works in proximity to and frequents the Project area, will be negatively impacted by, among other things, the noise, dust, vibrations, and reduced air quality in the vicinity of their home, and is specially harmed by the construction and operation of the Project.

38.    Plaintiff Shawn Martin resides at 889 Humboldt Parkway, Buffalo New York, lives or works in proximity to and frequents the Project area, will be negatively impacted by, among other things, the noise, dust, vibrations, and reduced air quality in the vicinity of their home, and is specially harmed by the construction and operation of the Project.

39.     Plaintiff Linda Anderson resides at 839 Humboldt Parkway, Buffalo New York, lives or works in proximity to and frequents the Project area, will be negatively impacted by, among other things, the noise, dust, vibrations, and reduced air quality in the vicinity of their home, and is specially harmed by the construction and operation of the Project.

40.     Plaintiff Pagan Fraiser resides at 153 Brunswick Boulevard, Buffalo New York, lives or works in proximity to and frequents the Project area, will be negatively impacted by, among other things, the noise, dust, vibrations, and reduced air quality in the vicinity of their home, and is specially harmed by the construction and operation of the Project.

41.     Plaintiff Eve Shippens resides at 322 Amherst Street, Buffalo New York, lives or works in proximity to and frequents the Project area, will be negatively impacted by, among other things, the noise, dust, vibrations, and reduced air quality in the vicinity of their home, and is specially harmed by the construction and operation of the Project.

42.     Plaintiff Andre R. Betts II resides at 507 Northland Avenue, Buffalo New York, lives or works in proximity to and frequents the Project area, will be negatively impacted by, among other things, the noise, dust, vibrations, and reduced air quality in the vicinity of their home, and is specially harmed by the construction and operation of the Project.

43.     Plaintiff Cheryl Griffin resides at 465 Northland Avenue, Buffalo New York, lives or works in proximity to and frequents the Project area, will be negatively impacted by, among other things, the noise, dust, vibrations, and reduced air quality in the

vicinity of their home, and is specially harmed by the construction and operation of the Project.

44.     Plaintiff Cynthia R. Barber resides at 102 W. Parade Avenue, Buffalo New York, lives or works in proximity to and frequents the Project area, will be negatively impacted by, among other things, the noise, dust, vibrations, and reduced air quality in the vicinity of their home, and is specially harmed by the construction and operation of the Project.

45.     Plaintiff June R. Thompson resides at 102 W. Parade Avenue, Buffalo New York, lives or works in proximity to and frequents the Project area, will be negatively impacted by, among other things, the noise, dust, vibrations, and reduced air quality in the vicinity of their home, and is specially harmed by the construction and operation of the Project.

46.     Plaintiff Vickie Peyton resides at 463 Northland Avenue, Buffalo New York, lives or works in proximity to and frequents the Project area, will be negatively impacted by, among other things, the noise, dust, vibrations, and reduced air quality in the vicinity of their home, and is specially harmed by the construction and operation of the Project.

47.     Plaintiff Laureen Nichols resides at 459 Northland Avenue, Buffalo New York, lives or works in proximity to and frequents the Project area, will be negatively impacted by, among other things, the noise, dust, vibrations, and reduced air quality in the vicinity of their home, and is specially harmed by the construction and operation of the Project.

48.     Plaintiff Freddie Mills resides at 229 Landon Street, Buffalo New York, lives or works in proximity to and frequents the Project area, will be negatively impacted by, among other things, the noise, dust, vibrations, and reduced air quality in the vicinity of their home, and is specially harmed by the construction and operation of the Project.

49.     Plaintiff Claudia N. Bigham resides at 522 East Utica Street, Buffalo New York, lives or works in proximity to and frequents the Project area, will be negatively impacted by, among other things, the noise, dust, vibrations, and reduced air quality in the vicinity of their home, and is specially harmed by the construction and operation of the Project.

50.     Plaintiff Matthew D. Chase resides at 233 Blaine Avenue, Buffalo New York, lives or works in proximity to and frequents the Project area, will be negatively impacted by, among other things, the noise, dust, vibrations, and reduced air quality in the vicinity of their home, and is specially harmed by the construction and operation of the Project.

51.     Plaintiff Terry Ann Patterson resides at 640 Norfolk Avenue, Buffalo New York, lives or works in proximity to and frequents the Project area, will be negatively impacted by, among other things, the noise, dust, vibrations, and reduced air quality in the vicinity of their home, and is specially harmed by the construction and operation of the Project.

52.     Plaintiff Kimberly Smiley resides at 817 Humboldt Parkway, Buffalo New York, lives or works in proximity to and frequents the Project area, will be negatively impacted by, among other things, the noise, dust, vibrations, and reduced air quality in the

vicinity of their home, and is specially harmed by the construction and operation of the Project.

53.     Plaintiff Denise B. Wilson-Shannon resides at 795 Humboldt Parkway, Buffalo New York, lives or works in proximity to and frequents the Project area, will be negatively impacted by, among other things, the noise, dust, vibrations, and reduced air quality in the vicinity of their home, and is specially harmed by the construction and operation of the Project.

54.     Plaintiff Joyce Wilson resides at 795 Humboldt Parkway, Buffalo New York, lives or works in proximity to and frequents the Project area, will be negatively impacted by, among other things, the noise, dust, vibrations, and reduced air quality in the vicinity of their home, and is specially harmed by the construction and operation of the Project.

55.     Plaintiff Heather Craig resides at 250 Brunswick Boulevard, Buffalo New York, lives or works in proximity to and frequents the Project area, will be negatively impacted by, among other things, the noise, dust, vibrations, and reduced air quality in the vicinity of their home, and is specially harmed by the construction and operation of the Project.

56.     Plaintiff Tara Martin resides at 889 Humboldt Parkway, Buffalo New York, lives or works in proximity to and frequents the Project area, will be negatively impacted by, among other things, the noise, dust, vibrations, and reduced air quality in the vicinity of their home, and is specially harmed by the construction and operation of the Project.

57.     Plaintiff Stephen Rutherford resides at 80 W. Parade Avenue, Buffalo New York, lives or works in proximity to and frequents the Project area, will be negatively impacted by, among other things, the noise, dust, vibrations, and reduced air quality in the vicinity of their home, and is specially harmed by the construction and operation of the Project.

58.     Plaintiff Ulysses Green resides at 288 St. Lawrence Avenue, Buffalo New York, lives or works in proximity to and frequents the Project area, will be negatively impacted by, among other things, the noise, dust, vibrations, and reduced air quality in the vicinity of their home, and is specially harmed by the construction and operation of the Project.

59.     Plaintiff Melissa Virelle resides at 26 Linden Park LWR, Buffalo New York, lives or works in proximity to and frequents the Project area, will be negatively impacted by, among other things, the noise, dust, vibrations, and reduced air quality in the vicinity of their home, and is specially harmed by the construction and operation of the Project.

60.     Plaintiff Lorna Peterson resides at 1088 Delaware Avenue, Buffalo New York, lives or works in proximity to and frequents the Project area, will be negatively impacted by, among other things, the noise, dust, vibrations, and reduced air quality in the vicinity of their home, and is specially harmed by the construction and operation of the Project.

61.     Plaintiff Charles E. Washington resides at 32 Linden Park, Buffalo New York, lives or works in proximity to and frequents the Project area, will be negatively impacted by, among other things, the noise, dust, vibrations, and reduced air quality in the

vicinity of their home, and is specially harmed by the construction and operation of the Project.

62.    Plaintiff Shirley Hough resides at 28 Linden Park, Buffalo New York, lives or works in proximity to and frequents the Project area, will be negatively impacted by, among other things, the noise, dust, vibrations, and reduced air quality in the vicinity of their home, and is specially harmed by the construction and operation of the Project.

63.    Plaintiff Sharon L. Mack resides at 855 Humboldt Parkway, Buffalo New York, lives or works in proximity to and frequents the Project area, will be negatively impacted by, among other things, the noise, dust, vibrations, and reduced air quality in the vicinity of their home, and is specially harmed by the construction and operation of the Project.

64.    Plaintiff Justin Colvin resides at 38 Linden Park, Buffalo New York, lives or works in proximity to and frequents the Project area, will be negatively impacted by, among other things, the noise, dust, vibrations, and reduced air quality in the vicinity of their home, and is specially harmed by the construction and operation of the Project.

65.    Plaintiff Justin Stachowski resides at 38 Dignity Circle, Buffalo New York, lives or works in proximity to and frequents the Project area, will be negatively impacted by, among other things, the noise, dust, vibrations, and reduced air quality in the vicinity of their home, and is specially harmed by the construction and operation of the Project.

66.    Plaintiff Cheryl D. Harris resides at 108 Landon Street, Buffalo New York, lives or works in proximity to and frequents the Project area, will be negatively impacted by, among other things, the noise, dust, vibrations, and reduced air quality in the

vicinity of their home, and is specially harmed by the construction and operation of the Project.

67.     Plaintiff Ursula Y. Goodloe resides at 591 Northampton Street, Buffalo New York, lives or works in proximity to and frequents the Project area, will be negatively impacted by, among other things, the noise, dust, vibrations, and reduced air quality in the vicinity of their home, and is specially harmed by the construction and operation of the Project.

68.     Defendant FHWA, which is partly funding the Project along with New York State Department of Transportation ("NYSDOT"), is a federal agency of the United States Department of Transportation with its main office located at 1200 New Jersey Avenue SE, Washington, DC 20590.

69.     Defendant Shailen Bhatt, is the Administrator of the FHWA, with offices located at 1200 New Jersey Avenue SE, Washington, DC 20590.

70.     Defendant Richard J. Marquis, is the Division Administrator, New York Division of the FHWA, with offices located at Leo W. O'Brien Federal Building, 11A Clinton Ave, Albany, NY 12207.

71.     Defendant New York State Department of Transportation is an agency of the State of New York with its main office located at 50 Wolf Road, Albany, New York 12232, and its local Region 5 office located at 100 Seneca Street, Buffalo New York 14203.

72.     Respondent Marie Therese Dominguez is the Commissioner of NYSDOT, with offices located at 50 Wolf Road, Albany New York 12232.

73.     Respondent Stephanie Winkelhake, P.E. is the Chief Engineer of NYSDOT, with offices located at 50 Wolf Road, Albany New York 12232.

## STATUTORY BACKGROUND

### The National Environmental Policy Act

74.     NEPA declares "a national policy which will encourage productive and enjoyable harmony between" people and their environment and "promote efforts which will prevent or eliminate damage to the environment" while promoting the health and welfare of our communities.  42 U.S.C. § 4321.

75.     NEPA applies to "major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(C).

76.     The White House Council on Environmental Quality ("CEQ") promulgates general regulations implementing NEPA that are binding on all federal agencies.  *See* 40 C.F.R. § 1500.3.

77.     NEPA is a "procedural statute intended to ensure Federal agencies consider the environmental impacts of their actions in the decision-making process."  40 C.F.R. § 1500.1(a).

78.     An action by the FHWA to fund a highway construction project is a federal action subject to NEPA.  *See* 23 C.F.R. § 771.107; NYS Route 33, Kensington Expressway Project, Final Design Report/Environmental Assessment (hereinafter "FDR/EA") at 6.[1]

79.     Federal agencies fulfill their NEPA obligations in one of three ways: by preparing an Environmental Impact Statement ("EIS"), by preparing an environmental

---

[1] A copy of the FDR/EA is publicly available at https://kensingtonexpressway.dot.ny.gov/Content/files/FinalReport/551252%20Final_DR_EA_2_16_24.pdf and is incorporated herein by reference.

assessment ("EA") and Finding of No Significant Impact, or by determining the project is subject to a categorical exclusion.  40 C.F.R. §§ 1501.3, and 1501.4.

80.    An agency must prepare an EIS for all "major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(C); *see also* 40 C.F.R. § 1501.3(a)(3).

81.    The primary purpose of an EIS is to "serve as an action-forcing device by ensuring agencies consider the environmental effects of their action in decision making, so that the policies and goals defined in the Act are infused into the ongoing programs and actions of the Federal Government."  40 C.F.R. § 1502.1.(a).

82.    The EIS must include a "full and fair discussion of significant environmental impacts" of the proposed action, as well as "reasonable alternatives that would avoid or minimize adverse impacts or enhance the quality of the human environment."  40 C.F.R. § 1502.1(b).

83.    When the significance of the environmental effects is unknown, the agency must prepare an EA.  40 C.F.R. § 1501.5(a).

84.    For actions requiring an EA, the FHWA must "[d]etermine which aspects of the proposed action have potential for social, economic, or environmental impact; identify alternatives and measures that might mitigate adverse environmental impacts; and identify other environmental review and consultation requirements that should be performed concurrently with the EA."  23 U.S.C. § 771.119(b).

85.    Under CEQ regulations, an EA must "[b]riefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact."  40 C.F.R. § 1501.5(c).

86.     Effects of a proposed action include, among others, "ecological . . . aesthetic, historic, cultural, economic, social, or health, such as disproportionate and adverse effects on communities with environmental justice concerns, whether direct, indirect, or cumulative."  40 C.F.R. § 1508.1(i)(4).

87.     When considering the significance of a proposed action's impact, an agency must consider the context and intensity of an adverse effect including short and long term effects, the degree to which the action adversely affects public health and safety, the degree to which the action adversely affects historic and cultural resources and parks, the degree to which the potential impacts on the human environment are highly uncertain, the degree to which the action affects resources listed or eligible for listing on the National Register of Historic Places, and the "degree to which the action may adversely affect communities with environmental justice concerns."  *See* 40 C.F.R. § 1501.3(d).

88.     If, upon completion of an EA, the FHWA determines that a proposed action will not have a significant adverse environmental impact, it must issue a Finding of No Significant Impact, which "shall state the authority for any mitigation that the agency has adopted and any applicable monitoring or enforcement provisions . . . [and] state the enforceable mitigation requirements or commitments that will be undertaken and the authority to enforce them, such as terms and conditions or other measures in a relevant permit, incidental take statement, or other agreement."  *See* 23 C.F.R. § 771.121(a); 40 C.F.R. 1501.6(d).

89.     Executive Order 12,898 mandates that "each Federal agency shall make achieving environmental justice part of its mission by identifying and addressing, as appropriate, disproportionately high and adverse human health or environmental effects of

its programs, policies, and activities on minority populations and low-income populations in the United States . . . ."  Exec. Order No. 12,898, 59 Fed. Reg. 7629, 7629 (Feb. 16, 1994).

90. When considering a proposed action under NEPA, an agency must determine whether communities of color or low-income communities are present, and if so, whether there may be disproportionately high and adverse human health or environmental effects on those populations. *See* CEQ, Environmental Justice: Guidance Under the National Environmental Policy Act, at 9 (Dec. 10, 1997), https://www.epa.gov/sites/default/files/2015-02/documents/ej_guidance_nepa_ceq1297.pdf (hereinafter "CEQ Guidance").

### Section 106 of the National Historic Preservation Act

91. NHPA was enacted to encourage the preservation and protection of America's historic and cultural resources. *Ind. Coal Council, Inc. v. Luhan*, 774 F. Supp. 1385, 1387 (D.D.C. 1991).

92. Section 106 of the National Historic Preservation Act requires that prior to issuance of a federal permit or license, federal agencies must take into consideration the effects of that "undertaking" on historic properties.  54 U.S.C. § 306108.

93. The term "undertaking" includes any activity or project that requires a federal permit, license, or approval.  36 C.F.R. § 800.16(y).

94. NHPA sets out four steps to comply with the Section 106 process: (1) determine and document the area of potential effects; (2) review existing information on historic properties within the area of potential effects, including potential historic properties; (3) seek information from consulting parties and individuals who have knowledge of or concerns with the historic properties in the area; and (4) "gather information from any

Indian tribe [or Nation] . . . identified pursuant to § 800.3(f) to assist in identifying properties, including those located off tribal [or Indian Nation] lands, which may be of religious and cultural significance to them and may be eligible for the National Register." *Id.* § 800.4(a). In carrying out these obligations, the "agency official shall acknowledge that Indian [Nations] and tribes and Native Hawaiian organizations possess special expertise in assessing the eligibility of historic properties that may possess religious and cultural significance to them." *Id.* § 800.4(c)(1).

95.     The area of potential effects is defined to include the area where the undertaking "may directly or indirectly cause alterations in the character or use of historic properties" and is "influenced by the specific scale and nature of the undertaking." *Id.* § 800.16(d).

96.     Effects are defined to include "reasonably foreseeable effects caused by the undertaking that may occur later in time, be farther removed in distance or be cumulative." *Id.* § 800.5(a)(1).

97.     An adverse effect is found when the undertaking may alter, directly or indirectly, any of the characteristics that make a property historic and eligible for inclusion in the National Register.  See 36 C.F.R. §§ 800.5(a)(1), 800.16(i).

98.     Such adverse effects include physical damage part of the property or a change in the character of the property's use.  See 36 C.F.R. § 800.5(a)(2).

### Section 4(f) of the Department of Transportation Act

99.     Section 4(f) of DOTA provides that the Secretary of Transportation may approve a transportation program or project requiring the use of land of an historic site of national, State, or local significance only if (1) there is no prudent and feasible alternative

to using that land; and (2) the program or project includes all possible planning to minimize harm to the historic site resulting from the use. 49 U.S.C. § 303(c).

100.     The Secretary of Transportation has delegated this responsibility to the FHWA.  49 C.F.R. § 1.45(4).

101.     FHWA's regulations implementing section 4(f) identify the historic sites that are subject to Section 4(f) include "all properties on or eligible for the National Register of Historic Places."  23 C.F.R. § 771.135(e).

102.     Because the historic properties protected by Section 106 are similarly defined, FHWA must complete its Section 106 of the NHPA determinations before it can comply with section 4(f) of DOTA.

### The Administrative Procedures Act

103.     The APA governs judicial review of an agency's compliance with the NEPA and the NHPA.

104.     Under the APA, a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "in excess of statutory jurisdiction [or] authority," or "without observance of procedure required by law."  5 U.S.C. § 706(2).

105.     The APA authorizes the award of declaratory and injunctive relief.  5 U.S.C. § 703.

**Project Background**

*A.*    ***Construction of the Kensington Expressway Destroys the Humboldt Parkway and Divides the Community***

106.    The Project site was once home to the Humboldt Parkway, an integral part of the system of continuous park lands, park approaches, and parkways designed by Frederick Law Olmsted, first opened in 1873.

107.    It stretched from Main Street eastwards, then curved south from around East Delavan and ended at Humboldt Park, now known as Martin Luther King Jr. Park ("MLK Jr. Park").

108.    Humboldt Parkway passes through a number of venerable Buffalo neighborhoods, including Trinidad in the northeast, Hamlin Park in the northwest, Delavan Grider and MLK Jr. Park on the east, and Masten Park and the Fruit Belt on the west.

109.    Humboldt Parkway provided a refuge of park greenery within the bustling city for generations of Buffalonians.

110.    Nonetheless, through a series of projects from the 1950s through 1971, governmental agencies gutted the Humboldt Parkway and constructed a vast cement chasm for the purpose of constructing the six-lane Kensington Expressway.

111.    As a result of the construction of Kensington Expressway, the Trinidad neighborhood was left at grade with tens of thousands of vehicles passing close by daily.

112.    The Hamlin Park and Delavan-Grider neighborhoods likewise, for much of their abutment of the Kensington Expressway, see tens of thousands of vehicles passing by daily.

113.    The FDR/EA describes the Kensington Expressway between the New York State Thruway (I-90) and the Elm Street-Oak Street as an arterial that now functions as a major link in the regional transportation system used by 75,000 vehicles per day as a direct link to the Downtown Buffalo core from major routes such as the Scajaquada Expressway (NYS Route 198) and I-90, and as a high volume commuter route between Downtown Buffalo and the City's northern and eastern neighborhoods, and the Buffalo Niagara International Airport. *See* FDR/EA at p. ES-5.

114.    The existence of the Kensington Expressway in the midst of these neighborhoods over the past sixty years has brought with it a frightening magnitude of illness.

115.    According to EPA data, the populations around the Expressway, compared to New York State as a whole, have a higher prevalence of asthma among adults aged 18 and older (98th percentile), higher prevalence of heart disease (98th percentile), low life expectancy (99th percentile), and higher proportion of persons with disabilities (91st percentile). *See id.*, at 178.

116.    The neighborhoods adjacent to the Project area have been designated as "Disadvantaged Communities" by the State of New York under New York's Climate Leadership and Community Protection Act ("CLCPA").  *See Id.*

**B.**    ***FHWA in Conjunction with the State Proposes the Project as Partial Mitigation of Harm Caused by Kensington Expressway***

117.    On January 22, 2022, Governor Kathy Hochul announced that FHWA and NYSDOT would commence an environmental review of project concepts to reconnect the east-west neighborhoods divided by the construction of the Kensington

Expressway (the "Announcement").  *See*  https://www.governor.ny.gov/news/governor-hochul-announces-unprecedented-investments-reconnect-communities-across-new-york.

118.    The Announcement stated that the "federally required review will examine the environmental, community, economic and other impacts associated with a partial or full cover of the current Expressway, with the goal of achieving a preferred alternative. [NYSDOT] will work aggressively with the [FHWA] to streamline the environmental review process." *Id.*

119.    FHWA, as an agency carrying out a federal highway project, was required to conduct an environmental review for the Project pursuant to NEPA.  *See* 23 C.F.R. § 771.115(c); 23 C.F.R. § 771.109(a)(1); FDR/EA at 6.

**C.    NYSDOT's "Scoping" Fails to Meaningfully Define Environmental Review of the Project**

120.    On June 30, 2022, a "Public Scoping Meeting" was conducted whereat it displayed preliminary conceptual designs for the Project and invited public comment during a subsequent 30 day period.  *See* FDR/EA at 20.

121.    Instead of a substantive document directing the scope of environmental review, the public was merely given an opportunity to comment on "preliminary design concepts" with essentially no detail on what the extent of environmental review for the Project would entail.  *See* Project scoping materials.[2]

122.    For instance, the sole information presented at that time with regards to air quality was a poster stating that air sampling near the Project was conducted on March 22-23 and compared to nearby New York State Department of Environmental

---

[2]    A copy of the Project scoping materials that were provided at the Public Scoping Meeting for public comment are publicly available at https://kensingtonexpressway.dot.ny.gov/Documents.aspx and are incorporated herein by reference.

Conservation ("NYSDEC") air monitor locations and determined to be "well below NAAQS." *See id.*

123.    On December 20, 2022, FHWA and NYSDOT released a Project Scoping Report ("PSR"), intended to document the evaluation of project concepts and identify final alternatives to be considered for study in a Draft Design Report and Environmental Assessment ("DDR/EA").[3]

124.    FHWA states that the "purpose of the Project is to reconnect the community surrounding the defined transportation corridor and improve the compatibility of the corridor with the adjacent land uses, while addressing the geometric, infrastructure, and multi-modal needs within the corridor in its current location." PSR at 1.

125.    The PSR defined the limits of physical disturbance of the Project as extending "along the Kensington Expressway and Humboldt Parkway from approximately High Street (southern limit) to approximately Northland Avenue (northern limit), a total distance of approximately 7,100 feet, and include areas of proposed disturbance associated with regrading" ("Project Limits"). *Id.* at 2.

126.    Within the Project Limits are five east-west bridges which cross the Kensington Expressway at East Ferry Street, East Utica Street, Northampton Street, Dodge Street and Best Street (the "Project Bridges"). *Id*

127.    The PSR established four objectives to guide the refinement of the Project: (1) Reconnect the surrounding community by creating continuous greenspace to enhance the visual and aesthetic environment of the transportation corridor; (2) Maintain the vehicular capacity of the existing transportation corridor; (3) Improve vehicular,

---

[3]    A copy of the PSR is publicly available at https://kensingtonexpressway.dot.ny.gov/Content/files/ScopingReport/Project%20Scoping%20Report.pdf and is incorporated herein by reference.

pedestrian, and bicycle mobility and access in the surrounding community by implementing Complete Street roadway design features; and (4) Address identified geometric and infrastructure deficiencies within the transportation corridor. *Id.* at 11.

128.     The PSR also identified anticipated additional approvals and consultations needed for the project including from NYSDEC and New York State Office of Parks, Recreation, and Historic Preservation, State Historic Preservation Office ("SHPO"). *Id.* at 20.

129.     The PSR determined the study area of the subsequent DDR/EA would encompass the land within a 1,000 foot buffer of the Project Limits ("Study Area") to "accommodate for enough area to describe the existing conditions and evaluate the potential effects of the Project." *Id.* at 21.

130.     The PSR also established that the assessment methodologies for the project would follow FHWA and NYSDOT guidance and regulations and the DDR/EA would assess the social, economic and environmental effects of only two alternatives, a proposed build alternative ("Build Alternative") and a no-build alternative ("No-Build Alternative"). *Id.*

131.     The PSR laid out the social, economic and environmental considerations to be assessed in the DDR/EA, which included *inter alia*: (a) land use; (b) neighborhood character and community cohesion; (c) environmental justice and disadvantaged communities; (d) social groups benefitted or harmed; (e) historical and cultural resources; (f) parks and recreation areas; (g) visual resources; (h) air quality; (i) traffic noise; (j) asbestos; and (k) construction effects. *Id.* at 21-36.

132.    The PSR discussed 10 different potential concepts for the Project, including the No-Build Alternative, various permutations of a tunnel over the Kensington Expressway, variations of reconstruction of the Kensington Expressway at grade, and removal of the Kensington Expressway and the re-establishment of the former Humboldt Parkway design.  *Id.* at 38-55.

133.    Ultimately, the PSR unilaterally concluded only two alternatives met the FHWA's and NYSDOT's Project objectives, both of which were permutations of a 6 lane tunnel over 4,100 feet of the Kensington Expressway, and which were combined as the single Build Alternative.  *Id.* at 58.

134.    Along with the required No-Build Alternative, these were the only alternatives advanced for study by the DDR/EA.  *Id.* at 59.

135.    The final Project, as approved by FHWA, will cover a depressed section of the Expressway, creating two 4,150-foot-long tunnels between Sidney Street and Dodge Street which will provide three travel lanes in each direction, with an 8-foot-wide outside shoulder and 6-foot-wide inside shoulder. FONSI at 1.

136.    The Expressway will be regraded north of Sidney Street and south of Dodge Street to bring the expressway back to existing grade. *Id.*

137.    Humboldt Parkway will be reconstructed on a new alignment from Northampton Street to Sidney Street. *Id.*

138.    The existing bridge structures over the Kensington Expressway at East Ferry Street, East Utica Street, Northampton Street, and Dodge Street will be demolished. *Id.*

139.    The existing bridge structure at Best Street will be demolished and reconstructed with a wider bridge structure to accommodate new traffic roundabouts. *Id.*

140.    The Best Street interchange ramps will be completely reconstructed to provide two lanes on the Expressway eastbound and westbound off-ramps. *Id.* at 2.

141.    During construction, traffic using Humboldt Parkway will be detoured during various construction stages throughout the four and a half year construction duration. Additionally, Humboldt Parkway will be used for construction (truck) deliveries. *Id.*

142.    The PSR also included responses to public comments provided approximately 6 months earlier during the Public Scoping Meeting and comment period. *Id.* at Appendix E.

143.    Comments raised concerns regarding health impacts from the Project and the Kensington Expressway with regards to air quality, however FHWA's reply to these comments was generally limited to an assertion that an air quality analysis for the Project will be conducted and compared to National Ambient Air Quality Standards ("NAAQS"). *Id.* at Appendix E at 51.

144.    Comments also explained that comparison to NAAQS was not an adequate methodology to assess air impacts from the Project given the legacy of air quality related illnesses in the communities in the Study Area ("Study Communities"), including high rates of Asthma, and requested local air quality monitoring as part of environmental assessment of the Project. *Id.* at Appendix E at 53.

145.     FHWA generally responded that air quality monitoring for the Project will incorporate comparisons to NAAQS, which are purportedly designed to protect the "health of sensitive populations, such as asthmatics, children, and the elderly." *Id.*

146.     Comments were also provided on concerns over the duration and intensity of construction impacts resulting from the Project.  *Id.* at Appendix E at 59-60.

147.     In response, FHWA stated that construction methods and plans, as well as mitigation measures to mitigate construction impacts, would be developed and discussed in the DDR/EA.  *Id.*

**D.     FHWA's Draft Review Fails to Take a Hard Look at Potential Impacts of the Project**

148.     FHWA issued the DDR/EA in September 2023 which failed to adequately analyze potential impacts from the Project but nevertheless demonstrated the Project may include the potential for significant adverse environmental effects.

149.     The DDR/EA projected the Project would cost $1.07 billion dollars and would take at least 4 and a half years to complete.  *See* DDR/EA at 80.[4]

150.     The DDR/EA contained multiple inconsistencies and inadequacies with regard to its analysis of, *inter alia*, construction impacts, traffic impacts, and impacts to air quality.

151.     Additionally, the DDR/EA determined that the Project would likely result in significant adverse impacts, especially with regards to impacts from construction. *Id.* at 293.

---

[4]     A copy of the DDR/EA is publicly available at https://kensingtonexpressway.dot.ny.gov/Content/files/DraftDesignReport/Draft%20Design%20Report_Environmental%20Assesment.pdf and is incorporated herein by reference.

152.   With regards to air quality, the DDR/EA failed to establish appropriate baselines needed to accurately assess the Project's impacts on the communities within the Study Area.

153.   The DDR/EA acknowledged that the Study Communities within the Study Area rank disproportionately higher for almost all of the U.S. Environmental Protection Agency's ("USEPA") environmental justice risks.  *Id.* at 183-99.

154.   The USEPA's environmental justice screening program ("EJScreen") indicated that the Study Communities suffer from some of the highest rates in the country for asthma (98th percentile), heart disease (98th percentile), and low life expectancy (99th percentile).  *Id.* at 185.

155.   The DDR/EA stated that the Study Area, being within Erie County, is currently in "Attainment" meaning that the air quality in the area is within compliance of the NAAQS.  *Id.* at 251.

156.   To establish baseline measurements of ambient air quality in the Study Area, the DDR/EA utilized an existing NYSDEC air quality monitoring station located at the Thruway Authority Bridge Maintenance Facility Access Road (the "Buffalo Monitor").  *Id.* at 257.

157.   The Buffalo Monitor is located approximately three miles away from the Project, which the DDR/EA indicates was chosen because it is the closest monitor to the Project.  *Id.*

158.   Despite the DDR/EA's assertion that the Buffalo Monitor provides a "conservative" basis for establishing background concentrations of air pollutants, the EJScreen report for the area encompassing the Buffalo Monitor indicates that it enjoys

appreciably better air quality than the Study Area.  A copy of the EJScreen Report for the Buffalo Monitor and the Study Area are annexed hereto as **Exhibit A** and **Exhibit B**, respectively; *see also* DDR/EA at Appendix D7, at 7.

159.    Given comments regarding air quality related illnesses in the Study Area raised during the Project scoping, this material data discrepancy was one which FHWA should have or would have been aware of when developing the DDR/EA, but proceeded indifferently.  *See* PSR at Appendix E, at 51, 53.

160.    While the DDR/EA and the EJScreen indicated the Study Communities suffered from significant air quality problems including some of the highest rates of asthma in the country, the DDR/EA stated that, based on data from the Buffalo Monitor, the Study area was in compliance with all NAAQS, which are designed to protect "the health of sensitive populations such as asthmatics."  DDR/EA at 250, 257.

161.    This material contradiction in data—namely, that the Study Area was in compliance with NAAQS designed to protect against the occurrence of asthma, yet the communities in the Study Area suffer from crippling asthma rates— required further analysis of the Project's impacts that only an EIS can provide.

162.    Furthermore, due to the disproportionate air quality related impacts already visited on the Study Communities as indicated by the EJScreen, any additional air quality impacts caused by the Project would have a greater potential to cause a significant adverse impact.

163.    The DDR/EA's air quality analysis concluded that the Project would have an increase of air pollutant emissions, but determined such increase would not have significant air quality impacts because the modeled increase of pollutant emissions from the

Project, when added to baseline data from the Buffalo Monitor, allegedly remained in compliance with NAAQS.  *Id.* at 258, 264, 265, 267.

164.    The DDR/EA predicted that the greatest air quality impacts from the Project would occur at the proposed tunnel openings.  *Id.* at 259.

165.    Given the limited impacts predicted through the flawed air quality analysis, the DDR/EA offered limited and undefined mitigation measures.  *Id.* at 270-71.

166.    With regards to cultural resources, the DDR/EA noted that SHPO had concurred with the APE originally established by FHWA and NYSDOT, but that subsequent to such concurrence, changes to the Project resulted in "minor modifications" to the APE (the "Revised APE").  *Id.* at 220.

167.    Far from being minor modifications, the Revised APE, which added the Hamlin Park Historic District, expanded to almost three times the size of the original APE.  *Id.* at 222 (Figure 4.6-1).

168.    The DDR/EA also noted that there are 77 NRHP eligible or listed historic properties identified within the APE as well as four NRHP eligible or listed historic districts (Table 4.6-1 and Figure 4.6-1). The historic properties include: the Martin Luther King, Jr. Park Historic District, the Hamlin Park Historic District, the Humboldt Parkway Historic District West, the Humboldt Parkway Historic District East, and three residential historic districts (NRE and/or NRL[5]); 77 buildings contributing to the NRE or NRL historic districts, and six buildings that are individually NRE or NRL. *Id.* at 221.

169.    The DDR/EA also states that in accordance with 36 CFR 800.5 and 36 CFR 800.8, FHWA will continue to consider input from the consulting parties and the

---

[5] National Register Eligible (NRE) and National Register Listed (NRL).

public while the NEPA process continues but that "it is anticipated that the project will have No Adverse Effect on Historic Properties." *Id.* at 220.

170.    To satisfy the New York Eminent Domain Procedure Law public hearing requirements applicable to the Project, the FHWA and the NYSDOT made the DDR/EA available for public comment on September 12, 2023, held a public hearing on September 27, 2023, and accepted comments on the DDR/EA for an initial period of 45 days, which the FHWA extended to receive further comments through January 10, 2024. *See* FDR/EA at ES-16-17.

**E.    NYSDOT Issues the Final Design Report/Environmental Assessment, but Fails to Cure the Deficiencies of the Draft Review**

171.    The FDR/EA was issued by FHWA on February 16, 2024 and purportedly responded to "substantive comments received from the public and agencies on the [DDR/EA]."  FDR/EA at ES-1.  The FDR/EA finalized the design of the Build Alternative which consists of:

- covering the Kensington Expressway with a 4,150 foot long tunnel ("Tunnel") between Sidney Street and Dodge Street consisting of two tubes with three lanes of travel each;

- covering the Tunnel surface with a layer of soil and treed landscaping;

- regrading the Kensington Expressway north of Sidney Street and South of Dodge Street to bring it back to grade;

- reconstructing the Humboldt Parkway on either side of the Tunnel;

- removing the bridge structures over the Kensington Expressway at East Ferry Street, East Utica Street, Northampton Street, and Dodge Street;

- 35 -

- replacing signalized intersections and Kensington Expressway ramps at Best Street, Herman Street, and West Parade Avenue with roundabouts;

- replacing the bridge at Best Street with a wider bridge to accommodate the roundabouts;

- modifying the Best Street interchange ramps to provide two lanes each for Kensington Expressway ramps;

- elimination of the partial interchange Northampton Street and East Utica Street; and

- lowering the vertical profile of the Kensington Expressway within the Tunnel by up to 20 feet through the removal of rock and soil. *Id.* at 58-59.

172.    However, the FDR/EA failed to provide substantive responses to comments regarding the identified deficiencies of the DDR/EA and, despite documenting that the Project will have significant adverse impacts, failed to provide meaningful analysis of the same.

173.    For example, the Noise and Vibration Analysis Report ("NVAR") in Appendix D9 of the FDR/EA explains that constructions activities from the Project that could have noise impacts include "demolition, excavation, rock-blasting, sub-base preparation, roadway/bridge/tunnel construction, and other miscellaneous work." *Id.* at Appendix D9, at 14.

174.    Furthermore, the NVAR indicates that sensitive land uses in the Study Area which could be impacted by construction noise include "residential, places of worship, parks, medical facilities, playgrounds, sports facilities, and educational facilities." *Id.*

175.    Based on modeling performed and summarized in the NVAR, the FDR/EA concluded that construction related noise "would be considered disruptive to nearby receivers within a range of approximately 150 feet and closer" and "would have noise levels of greater than or equal to 80 dB(A) at distances of 100 to 150 feet or less during Project construction, which includes the residences along Humboldt Parkway and other sensitive land uses such as the Buffalo Museum of Science, Science Charter School, and MLK Jr. Park."  *Id.* at 294.

176.    With regards to vibration, the FDR/EA, based on analysis provided in the NVAR, concluded that Project construction will result in vibration above the accepted annoyance threshold at distances of 125 feet from construction activities, which would "include the first row of residences along Humboldt Parkway northbound and southbound." *Id.* at 296.

177.    The FDR/EA also explains that blasting vibration would be perceptible and would require pre- and post-construction building surveys up to 300 feet from blasting locations to assess for unanticipated damage.  *Id.* at 297.

178.    The NVAR concluded that mitigation is needed but the FDR/EA merely states that such mitigation plans will be developed and with generic reference to certain items to be included.  *See id.* at Table 3 (mitigation plans to be developed and implemented in the future include: a dust control plan, generic methods to limit air emissions from construction equipment, a "blasting program" consistent with general federal standards,  a "Construction Vibration Mitigation Plan" and a "Construction Noise Mitigation Plan").

179.    Additionally, the FDR/EA identified potential construction related air impacts including from fugitive dust and exhaust emissions.  *Id.* at 298.

180.    While FHWA explained in the PSR that two lanes of travel along the Kensington Expressway would have unacceptable traffic impacts, the FDR/EA determined such lane closure scenarios would exist during Project construction, including reducing Humboldt Parkway to a single lane at times.  *See*  PSR, Preliminary Traffic Study, Concept 7 Analysis, at 14, 49-51, Appendix C, at 14-17; FDR/EA at 134.

181.    Nevertheless, FHWA proposes to maintain two lanes of traffic in each direction during peak hours throughout the multiyear construction process from December 2024 through June 2029. FDR/EA p. 134-36, Appendix A8.

182.    Despite planned traffic disruption on a major route critical to regional transportation, the FDR/EA does not include a traffic study to evaluate displaced traffic during the construction period.

183.    While FHWA did have a preliminary traffic study prepared for inclusion in the PSR, it did not analyze or in any way consider four and one-half years of construction related impacts to traffic from the Build Alternative.

184.    As explained in the FDR/EA, FHWA found that a change to two lanes of traffic in each direction would create unacceptable adverse impacts to traffic (slower travel speeds; longer average travel times; traffic diversions to local streets with higher crash rates and greater potential conflicts with pedestrians/bicyclists) but did not even analyze impacts from construction related traffic displacement on local streets, nor assess impacts to travel speeds or times on the Kensington Expressway from lane closures and construction related slow-downs. Nor did the FHWA assess impacts on likely alternate routes to and

from the City center for daily commuters who look to avoid construction related congestion on the expressway (*e.g.* Genesee Street or Main Street).

185.   Worse still, the FDR/EA Section 3.5 acknowledges that expressway capacity will be reduced at times during off peak hours to a single lane of travel in each direction. *See* FDR/EA, p. 134.

186.   The ***only*** mitigation proposed by FHWA relative to traffic displacement from construction is "local roadway work, including milling, paving, driveway apron replacement (as needed) . . ." FDR/EA, p. ES-14, Table S-1.

187.   Furthermore, the FDR/EA concedes that traffic and transportation impacts would result from construction which would impact environmental justice populations "who often rely on public transit, walking, and bicycling to a greater extent than non-environmental justice populations."  FDR/EA at 196.

188.   Additional transportation related construction impacts detailed in the FDR/EA "include travel delays and increased traffic on adjacent local roads" and the removal along the Humboldt Parkway of "the existing 5-foot-wide bicycle lanes . . . until such a time when new pavement is installed." *Id.* at 302.

189.   With regards to air quality, the FDR/EA purports to have "[e]xpanded discussion of air quality effect and added new figures" in the section regarding environmental justice; whereas in the section focused on air quality impacts, the FDR/EA revised a minor modelling error but otherwise left the analysis and conclusions unchanged. *Id.* at 3-4.

190.   Comments on environmental justice stated that the Study Communities suffer from immense air pollutant burdens and the Project as analyzed in the

DDR/EA would only serve to continue such impacts, as well as causing other significant impacts resulting from construction activities, including blasting near residential homes. *Id.* at Appendix E3, at 41-42, 43.

191.    The FHWA failed to respond meaningfully to those comments, and the FDR/EA failed to analyze the Project's impacts on existing, chronic air quality related illnesses in the Study Communities, except to state that the localized air quality would continue to be in compliance with NAAQS.    *Id.* at 250, 257, 259,  Appendix E3, at 42, 43.

192.    Specifically with regard to air quality, commenters noted that the Project would likely have significant adverse impacts on air quality at the Tunnel portals which would affect schools, daycares, parks, and more, which already suffer from some of the highest rates of air quality related illness, such as asthma, in the country. *Id.* at Appendix E3, at 50-51, 52.

193.    Commenters also questioned the reliance on the air modeling performed and citing of NAAQS as evidence that the Project will not have a negative impact, given the existing high prevalence of air quality related illness in the Study Communities despite being in compliance with NAAQS as purported in the DDR/EA. *Id.* at Appendix E3, at 53.

194.    Commenters also questioned the appropriateness of using the Buffalo Monitor rather than performing baseline air monitoring in the Study Area. *Id.* at Appendix E3, at 54, 55.

195.    FHWA, in the FDR/EA, failed to substantively respond to the material deficiencies and contradictions in the DDR/EA's analysis and conclusions established by these comments. *Id.* at Appendix E3, at 50-55.

196.    Instead, FHWA repeated its assertion that the Buffalo Monitor was an appropriate baseline, despite the EJScreen indicating a disparity in air quality between the Study Area and the Buffalo Monitor.   *Id.* at Appendix E3, at 54, 55.

197.    FHWA also replied that based on the data from the Buffalo Monitor, the Project would not adversely impact the Study Communities because emissions would be in compliance with NAAQS, despite the clear contradiction raised by the commentators regarding the disproportionate air quality impacts already existing in the Study Area.   *Id.* at Appendix E3, at 51, 52, 53.

198.    Furthermore, the FDR/EA wholly ignored the existing prevalence in air quality related illnesses such as asthma in its analysis of air quality.

199.    With regards to cultural resources, FHWA stated that it applied the criteria of adverse effect (36 CFR 800.5(a)(1)) to the identified historic properties within the APE, and found that the Project would have No Adverse Effect on historic properties. FDR/EA at 214.

200.    In making this determination, FHWA stated that ". . . [d]irect, physical effects to historic properties are minor in nature and related to constructing sidewalks with Americans with Disabilities Act (ADA) crosswalks at intersections, and temporary easements for replacing driveway aprons." FDR/EA at 218.

201.    In addition, FHWA relied on construction related mitigation measures to protect National Register qualifying characteristics of historic resources. *Id.*

202.    While a number of Section 106 Consulting Parties expressed deep concern with FHWA's proposed finding of no adverse impacts to cultural resources and that an EIS should be prepared, (FDR/EA Appendix E3 03, 935-36, 952, 1062, 1101),

FHWA merely reiterated that it had conducted an appropriate Section 106 review and that mitigation would avoid adverse impacts.  FDR/EA Appendix E3_01, at 46-50.

**F.      *The FONSI Concludes that the Project Will Not Have a Significant Adverse Environmental Effect Despite Contrary Findings.***

203.    FHWA issued its Finding of No Significant Impact ("Determination" or FONSI") on February 16, 2024.

204.    The FONSI was intended to absolve FHWA of its duty to perform an EIS.  *See* FONSI.

205.    The FONSI concludes that the Project will not have a significant impact on the environment.  *Id.*  However, this is contrary to FHWA's own findings.

206.    For example, the FONSI arbitrarily concludes that the Project will not have a single significant adverse effect on air quality, despite stating that pollutant emissions will increase as a result of the Project in the Study Communities which already suffer disproportionate impacts from air pollution.  FONSI at 5, 7-8.

207.     Furthermore, the FONSI acknowledges that construction of the Project will have the potential to have significant adverse effects from noise, vibration, traffic, and air quality on residences and other sensitive land uses including the Buffalo Museum of Science, Science Charter School, and MLK Jr. Park over the course of at least 4 years.  *Id.* at 3, 5, 6, 7, 10-13.

208.    Accordingly, because the FONSI determined that the Project may have at least one significant environmental impact, FHWA was required to conduct an EIS, and its failure to do so was arbitrary and capricious.

209.    While the FONSI acknowledges the Project's potential for adverse environmental effects, FHWA dismisses their significance arguing such effects will be

appropriately mitigated based on a variety of conceptual mitigation measures.  In fact, the FONSI identifies almost 40 different mitigation requirements necessary to ensure that the Project will not have significant adverse environmental effects.  *Id.* at Table 2.

210.    These mitigation requirements cover a broad range of issues from air quality to noise and vibration, to hazardous materials and stormwater.

211.    Construction related mitigation alone has over 30 different "mitigation commitments." *Id.* at 16-22.

212.    These mitigation measures are also speculative and undefined and often not yet in existence.

213.    For example, with regard to air quality impacts, the FONSI states that mitigation will involve "investigation of wall treatments near portal tunnel exits" the implementation of which will occur if "feasible and practical to implement."  *Id.* at 14.

214.     Additionally, the FONSI requires the "[c]ontractor to develop and implement a blasting program designed to avoid the potential for damage to structures" and to "use lower emission equipment . . . where appropriate and to the extent practicable." *Id.* at 20.

215.    These speculative and undefined mitigation measures are not only not yet in existence and made available for review of potential efficacy, but may never be so if determined not practicable or feasible to implement, and FHWA, in the FDR/EA and the FONSI, failed to "state the authority for any mitigation that the agency has adopted and any applicable monitoring or enforcement provisions . . . [and] state the enforceable mitigation requirements or commitments that will be undertaken and the authority to enforce them . . . ."  *See* 23 C.F.R. § 771.121(a); 40 C.F.R. 1501.6(d).

216.    Furthermore, because FHWA failed to acknowledge the deficiencies and contradictions in information in the FDR/EA, its reliance on the same in issuing the FONSI was arbitrary and capricious.

**G.      FHWA Actively Obfuscated and Misled the Public Throughout the NEPA Process**

217.    From the start of this Project, FHWA and NYSDOT have been focused on one goal: avoiding the preparation of an EIS.  As stated by NYSDOT at a stakeholder meeting held on August 13, 2009 for the Project "[t]he decision to do an Environmental Assessment instead of an Environmental Impact Statement speeds up the process. NYSDOT is looking for ways to reduce the schedule as much as possible."  A copy of the meeting minutes from the August 13, 2009 stakeholder meeting is annexed hereto as **Exhibit C**, at p. 5.

218.    Further, at a stakeholder meeting held on October 15, 2009, stakeholders were told by representatives of NYSDOT that health was not a consideration of the Project.  A copy of the meeting minutes from the October 15, 2009 stakeholder meeting is annexed hereto as **Exhibit D** at p. 4.

219.    FHWA and NYSDOT engaged in a long-term and coordinated use of misdirection, misstatement, and selective presentation of information ("Misinformation").

220.    The result is both a deliberate understatement of the environmental impacts of the Project and a failure to follow the requirements of 40 C.F.R 1501.3(d), NEPA's criteria for determining "whether an adverse effect of the proposed action is significant."

221.    NEPA requires agencies like FHWA to provide meaningful opportunities for public participation.  The purpose is to inform the public of an agency's

proposed action, allow for meaningful engagement during the NEPA process, and ensure decision makers are informed by the views of the public.  In essence, NEPA requires that the process be transparent and informed.

222.    FHWA violated its public engagement obligations under NEPA by engaging in a campaign to solicit and gather positive public comments on the Project during the public engagement process.

223.    As an example, as shown by the complaint of Greg Delaney (the "Delaney Complaint"), the public comment record was skewed to be more favorable by pre-filled positive comment cards distributed and collected by a consultant working on the Project with FHWA and NYSDOT.  A copy of the Delaney Complaint is annexed hereto as **Exhibit E**.

224.    Additionally, the FONSI represents that the Scajaquada Creek flows under the expressway and thus will not be a factor.  *See* FONSI, p. 9.  However, the Soil Boring and Rock Core Reports prepared for the Project show that the excavation of the Project will result in the Project being lower than the creek.  *See* FDR/EA at Appendix A2, at p. 250.  This change is not addressed by FHWA.

225.    And the Technical Memorandum Tunnel Structure Type report prepared for the Project states "the tunnel drainage is set up to be collected and pumped due to being potentially hazardous." *See id.* at Appendix A12, Section 5.2.2.  This acknowledged potential hazard is not addressed.

226.    The FONSI states the Project will have "[b]eneficial effects from creation of approximately 11 acres of new publicly accessible greenspace," but then mischaracterizes this as an irrelevant factor requiring "no mitigation," failing to

acknowledge that such factor contributes to potential environmental impacts.  *See* FONSI at p. 5.

228. The FONSI states there will be "[n]o adverse effects on historic properties, as determined through the Section 106 of the National Historic Preservation Act process."  *See id.*, at p. 6.

228. FHWA and NYSDOT, having resolved from the start of the Project to avoid having to conduct an EIS, engaged in a long-term and coordinated use of Misinformation to do just that, and in doing so, failed to follow the requirements of NEPA.

**H.     FWHA and NYSDOT Failed to Adequately Consider GHG Emissions in accordance with CEQ Guidance.**

229. On January 9, 2023 the Council on Environmental Quality ("CEQ") published interim guidance entitled *Guidance: National Environmental Policy Act Guidance on Consideration of Greenhouse Gas Emissions and Climate Change* to "to assist agencies in analyzing greenhouse gas (GHG) and climate change effects of their proposed actions under the National Environmental Policy Act (NEPA)."  CEQ-2022-0005-0001.

230. FWHA and NSYDOT were obligated to follow this CEQ guidance in preparation of the FDR/EA and FONSI.

231. As stated in the CEQ guidance, "The United States faces a profound climate crisis and there is little time left to avoid a dangerous—potentially catastrophic— climate trajectory. Climate change is a fundamental environmental issue, and its effects on the human environment fall squarely within NEPA's purview."  *Id.*

232.     As a result, the CEQ guidance clearly instructs agencies to quantify all foreseeable greenhouse gas emissions associated with a proposed project, including both direct and indirect greenhouse gas emissions.

233.     In addition to accurately quantifying all direct and indirect GHG emissions resulting from a project, the agency "should place emissions in relevant context, including how they relate to climate action commitments and goals. This approach allows an agency to present the environmental and public health effects of a proposed action in clear terms and with sufficient information to make a reasoned choice between no action and other alternatives and appropriate mitigation measures." *Id.*

234.     Here, FHWA and NYSDOT failed to follow the CEQ guidance in conducting the FDR/EA and FONSI.

235.     First, The FDR/EA does not even acknowledge the specific CEQ Guidance on GHG emissions, which came out a full year before the FDR/EA was published, and it makes no attempt to explain how this project complies with those recommendations.

236.     Consequently, the FONSI contains clear error regarding the effect of the project on greenhouse gas emissions.

237.     In the FONSI, FHWA and NYSDOT summarize the effects of the project on greenhouse gas emissions as follows: "**Decrease of 0.04% regional vehicle miles traveled/greenhouse gas emissions/energy consumption compared to No Build**. Tunnel systems will require energy consumption and emissions, including lighting and ventilation. Overall, **Build Alternative will result in a net benefit with respect to greenhouse gas**

**emissions on an annual basis. No adverse effects in regard to energy and greenhouse gas emissions**." FONSI, at 8, § 4.1 (emphasis added).

238.    In preparation of the FONSI, FHWA and NYSDOT failed to follow the CEQ guidance by omitting the greenhouse gas emissions created by construction when quantifying its overall impact.

239.    Contrary to what the FONSI asserts, according to the FDR/EA itself, when accounting for the carbon emissions associated with construction and tunnel operations (as FWHA and NYSDOT are required to do), by 2050, the Project will have added 26,924 metric tons of greenhouse gas emissions to the atmosphere—the equivalent of burning more than three million gallons of gasoline.

240.    The addition of more than 26,000 metric tons of planet-warming greenhouse gas emissions into the atmosphere is inarguably an adverse effect of this Project.

241.    In addition, in preparing the FONSI and FDR/EA, FHWA and NYSDOT failed to "discuss whether and to what extent the proposal's reasonably foreseeable GHG emissions are consistent with GHG reduction goals, such as those reflected in the U.S. nationally determined contribution under the Paris Agreement. Federal planning documents that illustrate multi-decade pathways to achieve policy may also provide useful information, such as the Long-Term Strategy of the United States: Pathways to Net-Zero Greenhouse Gas Emissions by 2050." CEQ Guidance.

242.    On the contrary, FHWA's and NYSDOT's conclusion regarding the absence of adverse impacts pertaining to greenhouse gas emissions is arbitrary and capricious because, the net effect of the Project will be a significant increase in greenhouse gas emissions by the year 2050 according to the FDR/EA itself.

## COUNT 1

## THE FHWA VIOLATED NEPA IN ISSUING THE FDR/EA AND FONSI FOR THE PROJECT

243.    Plaintiffs incorporate by reference and reallege as though fully set forth herein, each and every allegation as set forth in the preceding paragraphs of this Complaint.

### a.    FHWA failed to take a hard look at the significant environmental impacts that will result from the Project when completing the FDR/EA

244.    Under CEQ regulations, an environmental assessment must "[b]riefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact."  40 C.F.R. § 1501.5(c).

245.    The FDR/EA acknowledged that the communities within the Project Area impacted by the Project suffered from significant environmental justice concerns such as astronomical asthma rates that are among the highest in the country.  FDR/EA at 178.

246.    Despite this, the FDR/EA failed to analyze the direct and obvious contradiction regarding its conclusion that air quality for the Project Area was allegedly in compliance with NAAQS which are which are purportedly designed to protect the "health of sensitive populations, such as asthmatics."  Id. at 242, 250.

247.    FHWA was put on notice of this contradiction through public comments throughout the environmental review of the Project but failed to address it.  *See* PSR at Appendix E at 51, 53, 59;  FDR/EA at 250, 257, 259,  Appendix E3, at 42, 43, 50, 51, 52, 53.

248.    The FHWA was aware that the Buffalo Monitor baseline measurements of air quality did not provide an adequate or conclusive comparison to model Project impacts, or at least warranted additional study through an EIS, but proceeded indifferently.

249.    FHWA acknowledged in the PSR that reduction of travel to two lanes along the Kensington Expressway would have nonacceptable traffic impacts, and the FDR/EA determined that such conditions would exist during construction of the Project during peak hours for more than four years, including reducing  Humboldt Parkway to a single lane at times. *See* PSR, Preliminary Traffic Study, Concept 7 Analysis, at 14, 49-51, Appendix C, at 14-17; FDR/EA at 134.

250.    Despite this, the FDR/EA failed to include a traffic study to evaluate displaced traffic impacts resulting from the Project construction.

251.    The FDR/EA, despite conceding that construction of the Project would result in transportation impacts on environmental justice populations within the Project Area  "who often rely on public transit, walking, and bicycling to a greater extent than non-environmental justice populations," failed to actually analyses the extent and intensity of such impacts.  FDR/EA at 196, 302.

252.    FHWA, by neglecting to analyze these and other known and obvious contradictions and absences in critical information regarding identified likely impacts resulting from the Project, failed to take a "hard look" at the potential environmental impacts of the Project as required by NEPA.

**b.     The FDR/EA and FONSI conclusion that the Project will not have significant environmental impacts is arbitrary and capricious**

253.    If, after consideration of an EA, an agency finds that a project is likely to have significant environmental impact, NEPA requires the agency to prepare an EIS.  42 U.S.C. § 4332(C); *see also* 40 C.F.R. § 1501.3(a)(3).

254.    The FDR/EA identifies multiple significant impacts likely to occur as a result of the Project.  *See* FONSI at 3, 5, 6, 7-8, 10-13.

255.    Despite these findings, the FHWA issued the FONSI.

256.    FHWA's issuance of the FONSI under such circumstances instead of proceeding with completing an EIS was arbitrary and capricious.

257.    Furthermore, FHWA's failure to take a hard look at the likely significant environmental impacts of the Project as described, *supra*, render the conclusions in the FDR/EA and FONSI arbitrary and capricious.

258.    Additionally, FHWA's attempt to obfuscate the nature of public comments and potential impacts related to the Project was arbitrary and capricious, an abuse of discretion, and not otherwise in accordance with law.

**c.     The mitigation proposed by the FHWA which was the basis of the FONSI was not backed by substantial evidence**

259.    Where an agency determines to issue a Finding of No Significant Impact, the same "shall state the authority for any mitigation that the agency has adopted and any applicable monitoring or enforcement provisions . . . [and] state the enforceable mitigation requirements or commitments that will be undertaken and the authority to enforce them, such as terms and conditions or other measures in a relevant permit,

incidental take statement, or other agreement." *See* 23 C.F.R. § 771.121(a); 40 C.F.R. 1501.6(d).

260.    The FONSI identifies almost 40 different mitigation requirements necessary to ensure that the Project will not have significant adverse environmental effects, including 30 mitigation commitments for construction impacts alone.  FONSI at Table 2.

261.    Many of these proposed mitigation measures intended to prevent the Project from resulting in significant environmental impacts are speculative or wholly undefined in the FONSI and FDR/EA, and lack any authority, and lack any monitoring or enforcement provisions necessary as required under NEPA.

262.    Accordingly, these mitigation measures are not supported by substantial evidence, and FHWA's reliance on the same in issuing the FONSI is arbitrary and capricious and a violation of NEPA.

**d.    The size and scope of the Project required the FHWA to conduct an EIS**

263.    Based on the size and scope of the Project, including the resulting significant adverse environmental impacts identified in the FDR/EA and FONSI which would occur over a time period of at least four years, FHWA was required to complete an EIS, and its failure to do so was arbitrary and capricious.

## COUNT 2

**THE FHWA VIOLATED SECTION 106 OF THE NHPA AND SECTION 4(F) OF DOTA IN ISSUING THE FDR/EA AND FONSI FOR THE PROJECT**

**a.     FHWA failed to take properly determine and document the Revised APE for the Project**

264.    Plaintiffs incorporate by reference and reallege as though fully set forth herein, each and every allegation as set forth in the preceding paragraphs of this Complaint.

265.    Section 106 requires FHWA to determine and document the area of potential effects associated with the Project including the identification of all NRE and NRL properties within the APE.  36 C.F.R. § 800.4(c)(1).

266.    While the Revised APE increased the size of the APE by almost four times, the FHWA described the change as a "minor modification" and failed to undertake the same level of review to identify historic properties within the revised APE as it did when identifying historic properties in the original APE including, but not limited to, field studies and consultation on historic properties with the APE with the Section 106 consulting parties.

267.    In doing so, FHWA failed to comply with the requirements of Section 106 of the NHPA and Section 4(f) of DOTA.

**b.     FHWA failed to develop appropriate mitigation to ensure that the construction of the Project will not have an adverse effect of eligible properties within the APE.**

268.    A Project has an adverse effect on a NRE or NRL property when it may alter, directly or indirectly, any of the characteristics that make a property historic and

eligible for inclusion in the National Register including physical damage or a change in the character of the property's use. See 36 C.F.R. § 800.5(a)(2).

269.    Construction of the Project will cause vibrations including vibrations associated with blasting to remove rock beneath the current surface of the Expressway.

270.    The FDR/EA acknowledges that construction of the Project, and, in particular, blasting associated with rock removal could adversely impact structures in close proximity to the Project  FDR/EA at 296-297.  The FDR/EA further states: "[t]he potential for building damage would be avoided through the design of the blasting program." *Id.* at 297.

271.    While the FDR/EA suggests various matters that will be addressed in the blasting program including the need for pre and post-blasting surveys of all structures within 300 feet of blasting, the specific details of the blasting program were not developed at the time of issuance of the FONSI.

272.    There are 77 NRHP eligible or listed historic properties within the APE, many of which are closer than 300 feet to the Project.

273.    The proposed to be developed in the future mitigation plan is wholly inadequate to ensure that at the time the FONSI was issued and the Project was approved, the Project will not result in physical damage to these NRE and NRL properties in violation of Section 106 of the NHPA and Section 4(f) of DOTA.

**c      FHWA failed to properly assess the Project's impacts to MLK Park, which is listed on the National Register of Historic Places.**

274.    A Project has an adverse effect on a NRE or NRL property when it may alter, directly or indirectly, any of the characteristics that make a property historic and

eligible for inclusion in the National Register including a change in the character of the property's use. See 36 C.F.R. § 800.5(a)(2).

275.    FHWA and NYSDOT will require temporary easements over more than half an acre of MLK Park, to facilitate construction of the Project.   Specifically, the Project involves the installation of temporary support of excavation tiebacks (metal cables) to be installed underground in rock beneath the Park's surface in two different Park locations.  FDR/EA at 226.

276.    This work will restrict public access to more than a half-acre of the park for approximately half of the anticipated construction duration - meaning for more than two years. *Id.*

277.    This is a significant taking of this NRL property which FHWA characterizes as "short-term." *Id.*

278.    This extended multi-year use of more than half an acre of a NRL property properly be characterized as "short-term" and may result in a change in the character of the property's use in violation of Section 106 of the NHPA.

279.    In addition, FHWA failed to properly evaluate prudent and feasible alternative to utilizing MLK Park and failed to appropriately minimize harm to MLK Park resulting from the use in violation of Section 4(f) of DOTA.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs pray that this Court:

A.      Enter a declaratory judgement finding that Defendants have violated NEPA,

Section 206 of the NHPA and Section 4(f) of DOTA.

B.      Enter an order vacating the FDR/EA and FONSI and requiring FHWA to

prepare an Environmental Impact Statement;

C.      Enjoin any construction of the Project until Defendants comply with the law;

D.      Award Plaintiffs costs of this action, including reasonable attorney fees; and

E.      Grant such further and other relief as this Court may deem just and proper.

**TRIAL BY JURY IS HEREBY DEMANDED**

Dated: Buffalo, New York
      July 15, 2024

PHILLIPS LYTLE LLP

By: _s/ Alan J. Bozer_

Adam S. Walters
Alan J. Bozer
Lindsey E. Haubenreich
One Canalside
125 Main Street
Buffalo, New York  14203-2887
Telephone No. (716) 847-8400
awalters@phillipslytle.com
abozer@phillipslytle.com
lhaubenreich@phillipslytle.com

Daniel J. Brady
Hagerty & Brady
69 Delaware Ave.
Suite 1010
Buffalo N.Y. 14202
Telephone No. (716) 856 9443
dbrady@hagerty-brady.com

*Attorneys for Plaintiffs*